[No. S085213. Jan. 24, 2002.]

In re ARTURO D., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ARTURO D., Defendant and Appellant.

[No. S085218. Jan. 24, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDALL RAY HINGER, Defendant and Appellant.

## COUNSEL

Alex Green, under appointment by the Supreme Court, for Defendant and Appellant Arturo D.

Amanda F. Doerrer, under appointment by the Supreme Court, and Patrick DuNah, under appointment by the Court of Appeal, for Defendant and Appellant Randall Ray Hinger.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman, Christopher W. Grove and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent in No. S085213.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, Laura Whitcomb Halgren and Ilana R. Butler, Deputy Attorneys General, for Plaintiff and Respondent in No. S085218.

## OPINION

GEORGE, C. J.—We granted review in these matters to determine whether, when a driver who has been detained for citation for a Vehicle

Code infraction fails to produce vehicle registration or personal identification documentation upon the request of the citing officer, the officer may conduct a warrantless search for such documentation, and, if so, the permissible scope of such a search. After briefing was complete, we consolidated these two matters for purposes of oral argument and opinion. We conclude that in these circumstances the Fourth Amendment to the United States Constitution, which prohibits unreasonable searches and seizures, permits limited warrantless searches of areas within a vehicle where such documentation reasonably may be expected to be found. Applying that standard, we conclude that the document searches in both cases were proper, and, accordingly, we reverse the judgment in *In re Arturo D.* (S085213), and affirm the judgment in *People v. Hinger* (S085218).

I.

A. *In re Arturo D.*

At approximately 11:30 p.m. on a weeknight in late August 1998, Suisun City Police Officer Rowe stopped minor Arturo D.'s extended cab truck, which had been traveling more than 70 miles per hour in a 50-mile-per-hour zone. Arturo was driving and was accompanied by two passengers, one of whom was stretched across the truck's rear pull-down seat. When asked for his identification, Arturo gave his name, date of birth, and a Vallejo address, but admitted that he lacked a valid driver's license and that the truck was not his. Arturo provided no documentary evidence as to his identity, proof of insurance, or vehicle registration. At that point, Officer Rowe planned to issue defendant a citation for speeding and for driving without a license. Rowe asked the occupants to exit from the truck, and they did so. From inside the front of the truck cab, Rowe then blindly felt with his hands under the driver's seat for documentation relating to the driver and the vehicle. Not encountering such documents, Rowe repositioned himself behind the driver's seat, bent down, and looked under the seat. Rowe found a glass smoking pipe located "towards the center" of the floor under the driver's seat. In the same location Rowe also found a blue box containing a white vial, which itself contained an unusable amount of white powder. Rowe asked whether the items belonged to Arturo, and he replied that they did.

Rowe issued a citation to Arturo for speeding and driving without a license, and because there was no licensed driver to drive away the truck, Rowe made arrangements to have the vehicle towed. (Veh. Code, §§ 12500, subd. (a), 14602.6, subd. (a), 22651, subd. (p).) Arturo went to the police station, planning to make a telephone call to arrange a ride home. At the police station Rowe examined the blue box more closely, discovering in an

internal compartment a plastic bindle containing a usable quantity of a white powdery substance that, after testing, proved to be methamphetamine. Arturo then was placed under arrest. The district attorney subsequently filed a petition alleging that Arturo came within the provisions of Welfare and Institutions Code section 602, in that he possessed methamphetamine (Health & Saf. Code, § 11377, subd. (a)) (count I) and an opium pipe (*id.*, § 11364) (count II), and had driven without a license (Veh. Code, § 12500, subd. (a)) (count III).

At the jurisdictional hearing, the trial court denied Arturo's suppression motion and sustained the petition as to counts II and III.[1] Thereafter the court adjudged Arturo a ward of the court, and he appealed. In a published opinion, Division Four of the First District Court of Appeal reversed the order denying Arturo's motion to suppress the smoking pipe, reasoning that "the scope of the officer's intrusion went beyond that justified by the need to locate registration [and other identifying documents] and accordingly, it was unreasonable as a search for registration [and other identifying] documents."

## B. *People v. Hinger*

In August 1997, while driving alone in his automobile, defendant Randall Hinger was stopped by Orange Police Officer Skinner for making unsafe lane changes. Hinger told Skinner that his name was "Randy Hinger" but that he did not have his driver's license with him, and that he had no documentation concerning the car he was driving. At some point during this process, Skinner noticed Hinger open the glove compartment of the vehicle. According to the officer, Hinger explained that he only recently had purchased the vehicle, or that he was in the process of purchasing it.

With Officer Skinner's permission, Hinger exited from the car. While Skinner used his radio to conduct a record check on Hinger's name and automobile, a backup officer arrived. While waiting for the requested record check, Skinner asked Hinger whether he could search the car. Hinger declined to consent. After Skinner informed Hinger that he would look for identification and registration notwithstanding Hinger's refusal, Hinger said he might have a wallet in the car after all, suggesting it could be in the glove compartment.

Officer Skinner noticed that the glove compartment that Hinger previously had opened was still ajar, exposing some loose papers. As Skinner later explained, "I wanted to find out who [defendant] was. I wanted to make sure

---

[1]The court found the evidence insufficient to establish that the blue box belonged to Arturo, and hence did not sustain the petition as to count I.

that the name he gave me was his real name and make sure that the vehicle that he was driving either was in the process of belonging to him or was not stolen, or just to document who the vehicle belonged to." Skinner opened the front passenger door and lifted up the loose papers in the glove compartment, but found no identifying documents or wallet. Skinner then walked to the driver's side of the car, opened the door, and looked under the front seat for the wallet, finding nothing there. The officer walked back to the passenger side of the car and looked under the passenger seat (apparently doing so from the vantage point of the front of the seat). There Skinner saw and seized a wallet. Upon opening the wallet, he found inside a form of identification—a check-cashing card with Hinger's photograph on it—and a clear plastic baggie containing methamphetamine.

Hinger was arrested for possession of methamphetamine and pleaded guilty to that charge after the superior court denied his motion to suppress the foregoing evidence. In an unpublished opinion, Division Three of the Fourth District Court of Appeal affirmed the judgment, finding that the officer's search for identifying documentation was reasonable under the circumstances and that the contraband found during the course of that search was admissible.

## II.

Vehicle Code sections 4462 and 12951[2] long have required that the person in the immediate control of an automobile present evidence of registration and a driver's license upon proper command of a peace officer. Section 4462, subdivision (a), provides: "The driver of a motor vehicle shall present the registration or identification card or other evidence of registration of any or all vehicles under his or her immediate control for examination upon demand of any peace officer." Section 12951, subdivision (b), provides: "The driver of a motor vehicle shall present his or her license for examination upon demand of a peace officer enforcing the provisions of this code." The reason for these provisions is plain: An officer who has stopped a vehicle for a traffic infraction and who plans to issue a citation needs to ascertain the true identity of the driver and the owner of the vehicle, in order to include that information on the citation and the written promise to appear. (*People v. McGaughran* (1979) 25 Cal.3d 577, 584, fn. 5 [159 Cal.Rptr. 191, 601 P.2d 207] [registration and license "documents are . . . the source of most of the information needed by the officer to complete the citation"].)[3] But what action by the officer is permissible when, upon proper demand, a

---

[2]All further statutory citations are to the Vehicle Code, unless otherwise indicated.

[3]As explained in *People v. McGaughran, supra,* 25 Cal.3d 577, 583, in most circumstances, "provided the offender satisfactorily identifies himself [citation], the officer must simply

motorist who has been stopped for a traffic violation fails to produce the registration or license documentation required by statute?[4]

■ The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." Although it is well established that motorists have a cognizable privacy interest against unreasonable searches and seizures, the United States Supreme Court frequently has observed that, in light of the pervasive regulation of vehicles capable of traveling on the public highways, individuals generally have a reduced expectation of privacy while driving a vehicle on public thoroughfares. (E.g., *New York v. Class* (1986) 475 U.S. 106, 112-113 [106 S.Ct. 960, 964-966, 89 L.Ed.2d 81] (*Class*) [upholding limited warrantless search of automobile to discover its vehicle identification number].) ■ The threshold question posed in the two cases before us is this: In the context of a valid traffic stop during which a driver fails to produce the required automobile registration, driver's license, or identification documentation upon an officer's proper demand, do the government's regulatory needs and the reduced expectation of privacy on the part of the driver operate to allow an officer, consistently with the Fourth Amendment, to conduct a limited warrantless search for such documentation?

A.

The leading case on this subject is *People v. Webster* (1991) 54 Cal.3d 411, 429 [285 Cal.Rptr. 31, 814 P.2d 1273] (*Webster*). There, California Highway Patrol (CHP) Officer Abbott stopped the defendant for speeding on a freeway. In response to the officer's request for a driver's license, the

---

prepare a written notice to appear (i.e., a citation or 'ticket') reciting the particulars of the violation (Veh. Code, § 40500, subd. (a)), and must release the offender when he signs a written promise to appear (*id.*, § 40504, subd. (a))." (Fn. omitted; see also *People v. Superior Court [Simon]* (1972) 7 Cal.3d 186, 199-200 [101 Cal.Rptr. 837, 496 P.2d 1205].) "Indeed, such a violator may entirely avoid the necessity for appearing in court: he may choose to deposit the prescribed bail by mail (§ 40510) and, by failing thereafter to appear, forfeit that amount in lieu of fine (§ 40512)." (*Id.*, at p. 199.)

[4] Section 40302, subdivision (a), permits an officer who plans to issue a Vehicle Code citation to accept "other satisfactory evidence of [the driver's] identity." As observed in *People v. Monroe* (1993) 12 Cal.App.4th 1174 [16 Cal.Rptr.2d 267], in which the court rejected constitutional due process/vagueness challenges to the statute (*id.*, at pp. 1190-1194), this "language . . . necessarily confers discretion on the officer to determine what 'satisfactory evidence' of identity may be under the circumstances, including the discretion to determine that only reliable, written evidence will do, or on the other hand, that the violator's oral statements of identity and promise to appear are sufficiently reliable to allow citation and release despite the lack of written evidence." (*Id.*, at p. 1182.) (We note that in *People v. McKay*, review granted Nov. 15, 2000, S091421,* we shall address the proper application of section 40302, subdivision (a), in the context of a stop of a bicyclist for a Vehicle Code violation.)

---

*Reporter's Note: For Supreme Court opinion, see 27 Cal.4th 601.

defendant produced only a birth certificate. (See *ante,* fn. 4.) As the officer wrote out the ticket, he asked who owned the vehicle. The defendant responded, incongruously, that his five passengers were hitchhikers and that one of them owned the car. The officer thereafter learned via radio that the defendant was wanted on an outstanding warrant and placed him in the officer's patrol car. Upon the subsequent arrival of backup officers, the officer returned to the stopped vehicle to ask the passengers which one of them owned the car. After all five denied ownership, Officer Abbott ordered the passengers out of the car, searched unsuccessfully for registration papers in the vehicle's glove compartment and on the sun visor, but did not find any registration document. In the course of that search he did notice, however, a wallet on the front seat, where one of the passengers had been sitting. Abbott asked each of the passengers and the defendant whether he owned the wallet. When all denied ownership, Abbott opened the wallet to determine its ownership, then observed that it belonged to another person. Later it was discovered that the defendant and four of his passengers earlier that day had robbed the individual who owned the wallet and on the preceding day had murdered another individual.

The defendant challenged the search on the grounds that "Abbott had neither a warrant, nor probable cause, nor justification based on exigent circumstances." (*Webster, supra,* 54 Cal.3d 411, 430.) This court upheld the search against the defendant's Fourth Amendment claim. We observed, in relevant part: "At the outset, we conclude Abbott acted properly when he . . . entered the car for the limited purpose of finding the registration. Then, as now, the Vehicle Code allowed a CHP officer, among others, to inspect a [registerable] vehicle and its title in order to determine ownership. (Veh. Code, § 2805, subd. (a).)[5] The law also required the driver of a motor vehicle to produce his or her license and registration for examination upon a

---

[5]At the times relevant to the *Arturo D.* and *Hinger* cases, section 2805 provided: "(a) For the purpose of locating stolen vehicles, a member of the California Highway Patrol, *or a member of a city police department or county sheriff's office whose primary responsibility is to conduct vehicle theft investigations,* may inspect any vehicle of a type required to be registered under this code, or any identifiable vehicle component thereof, on a highway or in any public garage, repair shop, terminal, parking lot, new or used car lot, automobile dismantler's lot, vehicle shredding facility, vehicle leasing or rental lot, vehicle equipment rental yard, vehicle salvage pool, or other similar establishment . . . , *and may inspect the title or registration of vehicles,* in order to establish the rightful ownership or possession of the vehicle or identifiable vehicle component. . . ." (Stats. 1988, ch. 392, § 1, p. 1735, italics added.)

Section 2805 was enacted in 1959, and the italicized language concerning police officers and sheriff's deputies was added in 1979. (Stats. 1979, ch. 252, § 1, p. 543.) Even before the 1979 amendment, the statute had been construed to allow *any* peace officer—not only members of the CHP—to conduct limited and appropriate searches for registration documents in vehicles stopped or found stopped on roadways and highways. (E.g., *People v. Martin* (1972) 23 Cal.App.3d 444, 447 [100 Cal.Rptr. 272] [approving limited search by police officer for registration documents during traffic stop]; *People v. Brown* (1970) 4 Cal.App.3d

peace officer's demand. ([Veh. Code], §§ 4462, subd. (a), 12951, subd. (b).) *Within constitutional limits, such statutes authorize an officer to enter a stopped vehicle and conduct an immediate warrantless search for the required documents.* (E.g., *People* v. *Faddler* (1982) 132 Cal.App.3d 607, 610-611 [183 Cal.Rptr. 328]; *People* v. *Burnett* (1980) 107 Cal.App.3d 795, 799-800 [165 Cal.Rptr. 781]; *Jackson* v. *Superior Court* (1977) 74 Cal.App.3d 361, 367 [142 Cal.Rptr. 299]; *People* v. *Martin*[, *supra*,] 23 Cal.App.3d 444, 447. . . .)" (*Webster, supra,* 54 Cal.3d at p. 411, 430, fns. omitted, italics added.)

We also noted in *Webster* that the vehicle "was validly detained on the highway for a moving traffic violation" and that given the "uncertain situation" concerning ownership of the car, the officer "was amply entitled to inspect the [vehicle's] registration to ascertain its owner before deciding whether to release or impound the vehicle." (*Webster, supra,* 54 Cal.3d 411, 430-431.) Commenting that it was reasonable for Abbott to order the passengers out of the vehicle and to search for the documentation himself,[6] we observed that "[a]t the time he saw the wallet, Abbott was confining his search to the visor and glove compartment, *traditional repositories of auto registrations.*" (*Webster*, at p. 431, italics added.) We concluded: "While engaged in these appropriate activities, Abbott saw the wallet lying in plain view in the now-empty interior. The observation and seizure of evidence in plain view from a position where the officer has a right to be is not constitutionally prohibited. (*People* v. *Rios* (1976) 16 Cal.3d 351, 357 [128 Cal.Rptr. 5, 546 P.2d 293].)" (*Ibid.*)

---

382, 385, 387 [84 Cal.Rptr. 390] [approving limited search by police officer for registration document in parked car]; *People v. Hunter* (1969) 1 Cal.App.3d 461, 463-464 [81 Cal.Rptr. 750] [same]; *People v. Cacioppo* (1968) 264 Cal.App.2d 392, 396-397 [70 Cal.Rptr. 356] [approving limited search by police officer for registration document during traffic stop]; *People v. Monreal* (1968) 264 Cal.App.2d 263, 264-265 [70 Cal.Rptr. 256] [approving limited search by police officer for registration document in parked car].) The legislative history of the 1979 amendment suggests that it was designed not to alter that construction or impair that authority, but merely to *expand* the scope of the statute to provide police officers and deputy sheriffs, assigned to investigate auto thefts, the authority to examine motor vehicles located in garages, repair shops, and automobile dismantlers' lots, etc. (See, e.g., Assem. Com. on Crim. Justice, Analysis of Sen. Bill No. 638 (1979-1980 Reg. Sess.) for hearing on June 11, 1979, p. 1 [citing and describing with approval *People v. Brown, People v. Hunter,* and *People v. Monreal*].) Contrary to suggestions by the Court of Appeal below in *Arturo D.*, there is no evidence that the Legislature intended by its 1979 amendment to withhold from police officers or sheriffs (as contrasted with CHP officers) statutory authority under section 2805 to conduct appropriate limited searches for registration documents in vehicles stopped or found on public roads.

[6]As observed in *People v. Faddler, supra,* 132 Cal.App.3d 607, 610, " '[i]n the ordinary situation where the safety of the officer or the public is not endangered thereby, a driver may himself retrieve and present his license for examination by an investigating police officer.' " But "[i]f officer safety warrants, . . . the officer may control the movements of the vehicle's occupants and retrieve the license himself." (*People v. Hart* (1999) 74 Cal.App.4th 479, 489 [86 Cal.Rptr.2d 762].)

Prior to and subsequent to *Webster, supra,* 54 Cal.3d 411, California courts have held in analogous circumstances that it is constitutionally proper for an officer to conduct a limited warrantless search of a vehicle for the purpose of locating registration and other related identifying documentation. (See cases cited in *Webster, supra,* 54 Cal.3d at p. 430, quoted *ante,* at p. 70;[7] see also *People v. Turner* (1994) 8 Cal.4th 137, 182 [32 Cal.Rptr.2d 762, 878 P.2d 521] *(Turner)*; *People v. Hart, supra,* 74 Cal.App.4th 479, 489; *People v. Miranda* (1993) 17 Cal.App.4th 917, 927 [21 Cal.Rptr.2d 785].)

## B.

The parties focus upon two decisions of the United States Supreme Court—one issued several years prior to the 1991 decision in *Webster, supra,* 54 Cal.3d 411, but not cited therein *(Class, supra,* 475 U.S. 106), and the other issued several years after *Webster (Knowles v. Iowa* (1998) 525 U.S. 113 [119 S.Ct. 484, 142 L.Ed.2d 492] *(Knowles)).* The Attorney General asserts that the first case, *Class,* supports *Webster* and the propriety of the searches here at issue. Defendants contend otherwise, and argue that in any event the second case, *Knowles,* undermines *Webster* and invalidates both searches.

## 1.

In *Class, supra,* 475 U.S. 106, two officers stopped the defendant driver for traffic infractions. The driver emerged from his car, closed the vehicle's door, and produced registration and insurance documents, but no license. One of the officers then opened the defendant's car door in order to look for the vehicle identification number (VIN), which was located on the doorjamb of cars made before 1969. Not seeing a VIN at that location, the officer decided to look for one in the other spot where a VIN regularly is found in more recently manufactured vehicles, on the top of the dashboard—an area normally visible from outside a vehicle. The officer reached inside the car to remove some papers covering that area of the dashboard, and in doing so he noticed the handle of a gun beneath the driver's seat. The gun was seized, and the defendant was arrested for possession of the weapon. *(Class, supra,* 475 U.S. at p. 108 [106 S.Ct. at pp. 962-963].)

The high court upheld the warrantless search on a five-to-four vote. All members of the court agreed that the Fourth Amendment was implicated and

---

[7]Other decisions, preceding *Webster, supra,* 54 Cal.3d 411, that have upheld similar limited searches include *People v. Vermouth* (1971) 20 Cal.App.3d 746, 752 [98 Cal.Rptr. 65]; *People v. Walker* (1969) 273 Cal.App.2d 720, 722-724 [78 Cal.Rptr. 439]; *People v. Cacioppo, supra,* 264 Cal.App.2d 392, 396-397; *People v. Monreal, supra,* 264 Cal.App.2d 263, 265; and *Mardis v. Superior Court* (1963) 218 Cal.App.2d 70, 72-74 [32 Cal.Rptr. 263].

that a search had occurred. All also agreed that the search was unsupported by probable cause to believe that the car was stolen or that it contained contraband, and that the search could not be justified under the so-called automobile exception[8] or any other exception to the Fourth Amendment's warrant requirement. It was also apparently conceded or assumed that no other recognized exception to the warrant requirement applied to allow the search.

In nonetheless upholding the search under a balancing test that considered " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion' " (*Class, supra,* 475 U.S. 106, 118 [106 S.Ct. 960, 968]), the majority emphasized, among other things, (i) the importance of the VIN system in tracking stolen vehicles and in promoting highway safety (*id.,* at pp. 111-112 [106 S.Ct. at pp. 964-965]),[9] (ii) the generally decreased expectation of privacy that drivers have with regard to automobiles, the VIN in particular,[10] and the pervasive regulatory scheme that surrounds the use of vehicles on public roads (*id.,* at pp. 113-114 [106 S.Ct. at pp. 965-966]), (iii) officer safety concerns (*id.,* at p. 116 [106 S.Ct. at p. 967]), and (iv) the limited nature of the search undertaken. In the latter respect, the majority observed that the officer did not "root about the interior" of the car or "reach into any compartments," but that the search was instead "focused in its objective, and no more intrusive than necessary to fulfill that objective." (*Id.,* at pp. 118-119 [106 S.Ct. at p. 968].)

[8]See, e.g., *Carroll v. United States* (1925) 267 U.S. 132 [45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790] and *United States v. Ross* (1982) 456 U.S. 798 [102 S.Ct. 2157, 72 L.Ed.2d 572] (both permitting warrantless vehicle searches supported by probable cause).

[9]The majority in *Class, supra,* 475 U.S. 106, 111 [106 S.Ct. 960, 964], explained: "The VIN consists of more than a dozen digits, unique to each vehicle and required on all cars and trucks. [Citation.] The VIN is roughly analogous to a serial number, but it can be deciphered to reveal not only the place of the automobile in the manufacturer's production run, but also the make, model, engine type, and place of manufacture of the vehicle. [Citation.] [¶] The VIN is a significant thread in the web of regulation of the automobile. [Citation.] The ease with which the VIN allows identification of a particular vehicle assists the various levels of government in many ways. For the Federal Government, the VIN improves the efficacy of recall campaigns, and assists researchers in determining the risks of driving various makes and models of automobiles. In combination with state insurance laws, the VIN reduces the number of those injured in accidents who go uncompensated for lack of insurance. In conjunction with the State's registration requirements and safety inspections, the VIN helps to ensure that automobile operators are driving safe vehicles. By making automobile theft more difficult, the VIN safeguards not only property but also life and limb. [Citation.] [¶] To facilitate the VIN's usefulness for these laudable governmental purposes, federal law requires that the VIN be placed in the plain view of someone outside the automobile . . . ." (Italics omitted.)

[10]The majority in *Class* stated that the legislatively mandated visibility of the VIN (i.e., placement on the dashboard in an area visible from outside the vehicle) made it "more similar to the exterior of the car than to the trunk or glove compartment." (*Class, supra,* 475 U.S. 106, 114 [106 S.Ct. 960, 966].)

Justice Brennan's dissent in *Class, supra*, 475 U.S. 106, 125 [106 S.Ct. 960, 972], argued that "[b]ecause the Fourth Amendment constrains the State's authority to search automobiles under the guise of 'regulation,' the fact that the Government uses the VIN as part of its scheme for regulating automobiles is insufficient to justify a search of the passenger compartment to retrieve such information." (Dis. opn. of Brennan, J., joined by two other justices, italics omitted.) Expanding on this theme, the dissenters argued that the search was not *justified* in any event, because the officer had no reason to search for the VIN—the driver having previously produced registration documentation. (*Id.* at pp. 127-131 [106 S.Ct. at pp. 972-975] (dis. opn. of Brennan, J.).)

Plainly, the high court's majority opinion in *Class, supra*, 475 U.S. 106, did not address the propriety of the limited type of search here at issue. But the majority's reasoning and approach in approving the limited warrantless search in *Class* are not inconsistent with a similar analysis and conclusion in the context of *Webster*-type searches.[11] (See 4 LaFave, Search and Seizure (3d ed. 1996) § 9.5(e), p. 296 ["*Class* may mean that in some circumstances the police may, without a reasonable suspicion that the person is armed and presently dangerous, enter a vehicle stopped for a traffic violation to seek out other required documentation"].)[12] Indeed, in at least one important respect, *Webster*-type searches may be more justifiable under the Fourth Amendment, in that the basis for a search for identification and registration documentation preparatory to the issuance of a citation would appear to be more compelling than the justification for a search to discover the VIN of a vehicle for which the driver already had produced apparently valid registration documentation.[13] It may be questioned whether a majority of the high court, or even the dissenters in *Class*, would have prohibited a limited warrantless search when, as in the cases before us, the driver, in response to

---

[11]As noted above, *Class* was not cited in *Webster, supra*, 54 Cal.3d 411, nor has it been cited in any of the other cases mentioned above, pre- or post-dating *Webster*.

[12]Similarly, a critic of the high court's opinion in *Class* asserts: "If a motorist, after a police request for [a driver's license or registration certificate], is unable to produce the requested document, then, under the reasoning of *Class*, an officer is entitled to enter the vehicle to secure the documents." (Maclin, *New York v. Class: A Little-Noticed Case With Disturbing Implications* (1987) 78 J. Crim. L. & Criminology 1, 6; see also *id.*, at pp. 28-29.)

[13]The original decision of the New York Court of Appeals in *Class* (*People v. Class* (1984) 63 N.Y.2d 491 [483 N.Y.S.2d 181, 472 N.E.2d 1009, 1012]) had invalidated the search on the ground that under the circumstances, the police had no reason or justification to search for the VIN merely because the driver had committed "an ordinary traffic violation." Indeed, as observed in Justice Brennan's dissenting opinion in *Class, supra*, 475 U.S. 106, 126, footnote 1 [106 S.Ct. 960, 972], the searching officer in *Class* ultimately "did not record the VIN he found in order to compare it with other identifying documents." Upon remand of *Class* from the United States Supreme Court, the New York high court concluded that the search was invalid on state constitutional grounds. (*People v. Class* (1986) 67 N.Y.2d 431 [503 N.Y.S.2d 313, 494 N.E.2d 444, 445].)

a proper demand, professes to lack the required documentation needed for an officer to issue a proper citation.[14] In sum, we conclude that the high court's decision in *Class* does not impair the general validity of *Webster*-type searches.

## 2.

As noted, defendants also question the continuing validity of limited warrantless searches for license and registration documents under *Webster* and related cases in light of the 1998 decision in *Knowles, supra,* 525 U.S. 113, in which the high court unanimously held that the Fourth Amendment prohibits a *full-scale* warrantless search of an automobile incident to the issuance of a traffic citation. As explained below, absent a clear indication to the contrary from the United States Supreme Court, we conclude that *Knowles* does not undermine *Webster* and related case law.

In *Knowles, supra,* 525 U.S. 113, 114 [119 S.Ct. 484, 486], an officer stopped the defendant for speeding and issued a citation. Thereafter, pursuant to state statute, the officer proceeded to conduct a full-scale warrantless search of the vehicle for contraband. In so searching, the officer discovered a bag of marijuana and a pipe under the driver's seat. (*Ibid.*) The state supreme court, analogizing to the full-scale warrantless search for contraband that would be permissible pursuant to a search incident to a custodial arrest (*United States v. Robinson* (1973) 414 U.S. 218 [94 S.Ct. 467, 38 L.Ed.2d 427] [search of person, incident to custodial arrest]; *New York v. Belton* (1981) 453 U.S. 454 [101 S.Ct. 2860, 69 L.Ed.2d 768] [search of automobile interior, incident to custodial arrest of car occupant]), upheld the search under what was characterized as a "search incident to citation" exception to the Fourth Amendment's warrant requirement. (*Knowles, supra,* 525 U.S. at p. 115 [119 S.Ct. at p. 487].)

The high court held that the twin rationales supporting the search incident to custodial arrest exception to the warrant requirement—officer safety and the need to preserve evidence for later use at trial—were not present on the facts in *Knowles*, in which the driver already had been issued a citation following a routine traffic stop. (*Knowles, supra,* 525 U.S. 113, 116-117 [119 S.Ct. 484, 487-488].) In rejecting the argument that a full "search incident to arrest" was justified in order to discover and preserve evidence, the high

---

[14]The officer in *Class* did not ask the defendant for the vehicle's VIN, nor did the officer give the defendant an opportunity to reveal the VIN, instead peremptorily searching for it in the vehicle. In any event, as explained below, in the context of a normal traffic stop an officer has no authority to search peremptorily for required documentation, but instead may conduct a search for such documentation only when the driver fails to produce it after first having been directed to do so.

court observed: "Once [the driver] was stopped for speeding *and issued a citation*, all the evidence necessary to prosecute that offense had been obtained." (*Id.*, at p. 118 [119 S.Ct. at p. 488], italics added.) Addressing the state's assertion that nevertheless a *full search* of the type that would be permissible incident to a custodial arrest also should be permissible " 'incident to citation' . . . because a suspect who is subject to a routine traffic stop may attempt to hide or destroy evidence related to his identity (*e.g.*, a driver's license or vehicle registration)" (*ibid.*), the court disagreed, stating that "if a police officer is not satisfied with the identification furnished by the driver, this may be a basis for arresting him rather than merely issuing a citation." (*Ibid.*) The court in *Knowles* concluded that the Fourth Amendment does not provide the police a right to conduct a *"full field* search" (*ibid.*, italics added) incident to the issuance of a citation, and hence found the full-scale warrantless search for contraband at issue in that case to be improper.

Defendants assert that *Knowles, supra,* 525 U.S. 113, implicitly precludes officers from conducting a warrantless search for registration or identification documents preparatory to the issuance of a traffic citation to a driver who fails to produce such documentation upon demand. We believe that *Knowles* is distinguishable. Unlike the situation in *Webster* and related decisions (and the cases presently before us), in *Knowles*—as the high court itself emphasized—the officer in that case already had issued the driver a citation (apparently the officer had obtained sufficient identifying information to complete that citation), and *thereafter* had conducted an unrelated *full-scale* warrantless search for contraband. Accordingly, the search at issue in *Knowles,* unlike those at issue in *Webster* and related cases (and those before us today) was not a limited one conducted for the narrow purpose of discovering required documentation that the driver had failed to produce upon demand and that was needed for the officer to issue a citation.[15]

Indeed, in *Knowles, supra,* 525 U.S. 113, the court repeatedly stressed throughout its brief opinion that the issue presented was the validity of a *"full search* of the car" (*id.*, at p. 114 [119 S.Ct. at p. 486] [twice so characterizing], italics added), a *"full-blown search"* (*id.*, at p. 115 [119 S.Ct. at p. 487], italics added), or a *"full field search"* (*id.*, at p. 118 [119 S.Ct. at p. 488], italics added). Absent contrary direction from the high court, at this juncture we agree with the Attorney General that the court in *Knowles* addressed itself only to the question of allowing a full-scale warrantless

---

[15]The type of search at issue in *Knowles, supra,* 525 U.S. 113, has been illegal under California law for nearly four decades. (*People v. Moray* (1963) 222 Cal.App.2d 743, 746-747 [35 Cal.Rptr. 432].)

search for contraband *following* the issuance of a traffic citation, and that the court did not address (nor do we read its opinion to cast doubt upon) the longstanding authority, established under California law as well as federal and sister state decisions,[16] permitting a police officer to conduct under certain circumstances a limited warrantless search of a vehicle for required regulatory documentation, *prior* to issuing a traffic citation.[17]

---

[16]In addition to *Webster* and the related California cases cited above, federal decisions decided prior to *Knowles* allowed *Webster*-type warrantless, limited searches for documentation (e.g., *United States v. Brown* (9th Cir. 1972) 470 F.2d 1120, 1122; *Kendrick v. Nelson* (9th Cir. 1971) 448 F.2d 25, 27-28), and at least one federal decision after *Knowles* asserts the validity of such limited searches. (*U.S. v. $109,179 in U.S. Currency* (9th Cir. 2000) 228 F.3d 1080, 1088 & fn. 47 [citing *United States v. Brown* for the proposition that "the police may conduct limited searches of vehicles to ascertain ownership on less than probable cause"].) State court decisions also support the propriety of such limited searches. (E.g., *State v. Taras* (1972) 19 Ariz.App. 7 [504 P.2d 548, 552] [when a driver is unable to produce proof of registration, an officer may conduct a limited search of the vehicle for evidence of automobile ownership "in places where [registration documents] may reasonably be found"; search of glove compartment upheld]; *State v. Acosta* (1990) 166 Ariz. 254 [801 P.2d 489, 493] [affirming *Taras* but holding that search for registration in "rear interior compartment"— requiring officer to "unscrew plastic bolts and remove the panel covering the compartment"— was "not reasonable as a search for registration papers"]; *People v. Epperley* (1975) 33 Ill.App.3d 886 [338 N.E.2d 581, 582] ["Because of the fact that the defendant was unable to produce a driver's license and also had been seen weaving on the highway, it would appear that the officers had a right to inspect the vehicle at least for the limited purpose of ascertaining the registration"]; *People v. Philbert* (2000) 270 A.D.2d 210 [707 N.Y.S.2d 14, 15] ["the record also supports the hearing court's alternate holding that the circumstances permitted a limited search of the glove compartment for vehicle documentation"]; *People v. Branigan* (1986) 67 N.Y.2d 860 [501 N.Y.S.2d 655, 492 N.E.2d 783, 784] [when driver who was stopped for a vehicle code violation looked through papers scattered on his front seat but was unable to produce a license or registration, police officer acted properly in ordering driver from car and looking through papers himself for such documentation]; but see *State v. Branham* (1997) 191 Ariz. 94 [952 P.2d 332, 335] [limiting *Taras* and *Acosta* and holding that failure to produce registration following a traffic violation stop, by itself, does not permit a warrantless limited search for such documentation].) In sum, we find no indication in *Knowles* that the court intended to place in doubt any of these state or federal decisions.

[17]We note various problems presented by other possible options in this factual setting. Recognizing the right of a driver to *elect* between, on the one hand, submission to a limited search for documentation, and, on the other, being arrested and transported to the police station for booking, in most circumstances would subject the driver to considerably greater intrusion. Indeed, if the driver were arrested, in many instances the vehicle also would be impounded and would be subject to an inventory search (see, e.g., *People v. Green* (1996) 46 Cal.App.4th 367, 373-375 [54 Cal.Rptr.2d 12] [upholding inventory search of automobile properly impounded upon the defendant's arrest for driving without driver's license])— a result considerably more intrusive than the limited search here at issue.)

Moreover, it might be argued that such a "choice" would be inherently tainted as coercive. We believe that a court should be wary of imposing a rule that effectively would allow a Vehicle Code violator to require, by his or her own election, that police agencies expend the considerable time and resources necessary to undertake a full stationhouse booking (with possible towing, impounding, and inventorying of a vehicle). As the Court of Appeal below observed in *People v. Hinger*, "[t]he direct approach" contemplated by a *Webster*-type limited

### III.

We proceed to address whether the warrantless searches here at issue were proper under the Fourth Amendment.

### A. *Arturo D.*

 Arturo first asserts that Officer Rowe had no reason to enter the vehicle to search for registration because, Arturo claims, the record discloses that the trial court found that he earlier had given the registration to the officer. The record does not support this reading. At one point during direct examination, the officer testified that when he asked Arturo for his license and registration, Arturo produced neither item. Thereafter, during cross-examination, the officer testified that he could not recall whether Arturo had produced the requested documentation. Still later, following further discussion concerning the evidence on this point, and in response to defense counsel's argument that Officer Rowe had no right to be where he was or to search, the trial court interrupted defense counsel and asserted: "There's no suggestion that the officer was doing anything other than looking for *documents of title and driver's identification.*" (Italics added.) To this, defense counsel replied, "That's right." The trial court immediately responded, "That's what he said."

This constitutes a finding by the trial court that when the officer searched the car, he was looking for *both* registration and driver identification. Of course, "the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence." (*People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; *People v. Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161] [because the trial court ruled on the suppression motion "after holding an evidentiary hearing pursuant to the motion, all factual conflicts must be resolved in the manner most favorable to the court's disposition of the motion"].) Here the trial court's finding is supported by substantial evidence—Officer Rowe's testimony on direct examination that when he asked Arturo for his license *and* registration, Arturo produced neither.[18] Accordingly, we must honor the trial court's finding that, when conducting his search, Officer Rowe was looking for both registration and license documentation.

search is "most logically calculated to get [the driver] on his way and the officer back to ferreting out more serious criminals in the least amount of time."

[18]As the Attorney General observed in his briefs, subsequent to the *suppression hearing* (the ensuing ruling of which we review here), Arturo testified at the *jurisdictional* hearing that he

Arturo also asserts that because he "candidly admitted" to Officer Rowe that he was 16 years of age and had no license, the officer accordingly had no right to search his vehicle for any license or other identification. Officer Rowe was not obligated to take the driver's word on these matters at face value, however. When the officer prepared to cite Arturo for a Vehicle Code violation, he had both a right and an obligation to ascertain the driver's true identity, to ensure that the driver's true name appeared on the citation and on the written promise to appear. We conclude that Officer Rowe was entitled to enter the vehicle to conduct a limited search for both registration and identification documents.

██ Arturo next asserts that a limited warrantless search under *Webster, supra,* 54 Cal.3d 411, and related cases must be confined to "traditional repositories" such as a glove compartment or a sun visor, and that the area under a driver's seat is not a traditional repository for registration or identification documents. The Attorney General, by contrast, asserts that an officer is entitled to conduct a nonpretextual warrantless search for such documents in those locations where such documentation reasonably may be expected to be found.

We agree with the Attorney General. Although we observed in *Webster, supra,* 54 Cal.3d 411, 431, that when the officer in that case "saw the wallet, [he] was confining his search to the visor and glove compartment, traditional repositories of auto registrations," we did not thereby restrict the scope of such a search to "traditional repositories" for auto registration documents. Instead, we merely explained that the officer in that case properly was searching in an area where such documentation reasonably could be expected to be found. Neither *Webster* nor any of the cases that it cited or that preceded it *confined* the scope of a permissible search for documentation to such so-called "*traditional* repositories."[19] Subsequently, in *Turner, supra,* 8 Cal.4th 137, 182, we observed that the warrantless search for documents in that case, "as in *Webster,*" was confined to "the glove compartment, a traditional repository of vehicle registration." Again, as the Attorney General explains, "this reference to a 'traditional repository' [was] descriptive rather than restrictive."

in fact gave the registration document to the officer. This testimony was not before the trial court at the time of the suppression hearing, and it is irrelevant to our inquiry now; in reviewing the trial court's suppression ruling, we consider only the evidence that was presented to the trial court at the time it ruled. (See, e.g., *People v. Drews* (1989) 208 Cal.App.3d 1317, 1324-1328 [256 Cal.Rptr. 846].) In any event, as the Attorney General observes, the trial court did not find Arturo's testimony at the jurisdictional hearing to be wholly truthful or accurate concerning other aspects of the case.

[19]Indeed, cases from other jurisdictions essentially have followed the standard suggested by the Attorney General, allowing limited searches for required documentation in locations where such documents "may reasonably be found." (See *State v. Taras, supra,* 504 P.2d 548, 552, described *ante,* at fn. 16.)

Although, as noted above, the United States Supreme Court has not specifically approved or defined the scope of a warrantless search of a vehicle for registration or identification documentation, our conclusion that under certain circumstances limited searches for required regulatory documentation are permissible in those locations where such documentation reasonably may be expected to be found, appears to be consistent with the high court's decision in *Class, supra,* 475 U.S. 106, upholding a warrantless limited search to allow an officer to observe a car's VIN during a stop following a traffic violation.

Our conclusion is also consistent with general Fourth Amendment case law concerning the scope of permissible searches (e.g., *Michigan v. Long* (1983) 463 U.S. 1032, 1049 [103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201] [protective search of passenger area of automobile is "limited to those areas where a weapon may be placed or hidden"]), and as noted above it is consistent with a number of prior California cases (see *ante,* at pp. 68-71) as well as cases from other jurisdictions (see *ante,* fn. 16). Finally, our conclusion also parallels the view of noted Fourth Amendment scholar Wayne R. LaFave, who, citing and describing *Webster, supra,* 54 Cal.3d 411, and *Turner, supra,* 8 Cal.4th 137, states: "Under a variety of circumstances, it is reasonable for the police to make a limited search of a vehicle in an effort to determine ownership. . . . [¶] . . . The better view is that if the driver has been given an opportunity to produce proof of registration but he is unable to do so, and even if he asserts that there is no such proof inside the car, the officer is not required to accept such an assertion at face value, at least when his 'previous conduct would . . . cast doubt upon his veracity'; at that point, the officer may look for registration papers 'on the dashboard, sun visor and steering column' and, if not found in those places or seen in plain view, in 'the glove compartment,' *all 'places where it reasonably may be found.'* " (3 LaFave, Search and Seizure, *supra,* § 7.4(d), pp. 566-567, italics added, fns. omitted; see also *id.,* p. 567, fn. 131.)[20]

We proceed to apply this standard to the facts of this case. As the Attorney General suggests in his briefs, some persons who are stopped for traffic violations may not wish to provide an officer with valid documentation showing the driver's true name or identity, or showing the name of the vehicle's owner. Some drivers who wish to avoid disclosing such documentation to the police may keep the documents under the driver's seat and yet disclaim their existence. Indeed, at the suppression hearing, the prosecutor

---

[20]Although Professor LaFave extensively discusses *Knowles, supra,* 525 U.S. 113 (see 3 LaFave, Search and Seizure (2001 supp.) § 5.2, pp. 14-20), he nowhere suggests that *Knowles* alters or undermines his approval, set out in the text above, of *Webster*-type limited warrantless searches.

argued that "it's not uncommon that people will shove their driver's license or their wallets underneath the seat while they're driving." The Attorney General argues that police officers, knowing this, reasonably may expect to find a wallet, or identification, or registration documents, under a driver's seat.

We conclude that case law supports the Attorney General's view. Although Arturo asserts that he was able to find only one case in which a wallet was found under a driver's seat, in fact numerous published appellate decisions report that drivers' wallets (and hence, often, identification) have been located under the front seats of vehicles. (E.g., *People v. Barrick* (1982) 33 Cal.3d 115, 121 [187 Cal.Rptr. 716, 654 P.2d 1243] [driver's wallet found under driver's seat]; *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 582, 587 [86 Cal.Rptr. 465, 468 P.2d 825] [driver's wallet found under front seat]; *People v. Bauer* (1969) 1 Cal.3d 368, 372 [82 Cal.Rptr. 357, 461 P.2d .637, 37 A.L.R.3d 1398] [driver retrieved his wallet from under driver's seat]; *People v. Alvarez* (1996) 49 Cal.App.4th 679, 685 [56 Cal.Rptr.2d 814] [driver's wallet found under driver's seat]; *Ingle v. Superior Court* (1982) 129 Cal.App.3d 188, 192 [181 Cal.Rptr. 39] [driver's wallet found under driver's seat]; *People v. Goss* (1980) 109 Cal.App.3d 443, 449 [167 Cal.Rptr. 224] [defendant's wallet found under front seat]; *People v. Bundesen* (1980) 106 Cal.App.3d 508, 510 [165 Cal.Rptr. 174] [defendant's wallet found under front passenger seat, where defendant had been sitting]; *People v. Bracamonte* (1967) 253 Cal.App.2d 980, 982 [61 Cal.Rptr. 830] [driver's wallet found under driver's seat]; *People v. Williams* (1965) 235 Cal.App.2d 389, 393 [45 Cal.Rptr. 427] [driver placed his wallet under front seat before exiting from car].) Indeed, in *People v. Hinger*, a wallet containing the driver's identification was found under the front seat of the vehicle (in that case, the front passenger seat).

Published decisions of other state and federal courts also report numerous instances of drivers' wallets being found under the front seats of vehicles. (E.g., *United States v. Dento* (3d Cir. 1967) 382 F.2d 361, 363 [driver's wallet found under front seat]; *Mallet v. Bowersox* (8th Cir. 1998) 160 F.3d 456, 457 [driver's wallet found under front seat]; *Cotton v. United States* (9th Cir. 1967) 371 F.2d 385, 389-390 [driver's wallet found under front seat]; *U.S. v. McCurdy* (10th Cir. 1994) 40 F.3d 1111, 1113 [defendant's wallet found under front seat]; *United States v. Gerlach* (E.D. Mich. 1972) 350 F.Supp. 180, 182 [driver's wallet found under front seat]; *United States v. Spitalieri* (N.D. Ohio 1975) 391 F.Supp. 167, 170 [defendant's wallet found under front seat]; *United States v. Day* (E.D.Pa. 1971) 331 F.Supp. 254, 255 [driver's wallet found under driver's seat]; *People v. Moore* (Colo. 1995) 900 P.2d 66, 68 [wallet of defendant, a car passenger, found under front passenger seat]; *Lewis v. State* (Fla.Dist.Ct.App. 1998) 711 So.2d 205, 206 [defendant's wallet found under front seat]; *People v. Jackson* (1987) 158 Ill.App.3d

394 [110 Ill.Dec. 746, 511 N.E.2d 923, 924] [defendant found victim's wallet under driver's seat in course of robbing him]; *Huey v. State* (Ind.Ct.App. 1987) 503 N.E.2d 623, 625 [driver's wallet found under driver's seat]; *Commonwealth v. Ellis* (1981) 12 Mass.App. 612 [427 N.E.2d 1179, 1182] [driver's license found under front seat]; *People v. Johnson* (1994) 206 A.D.2d 439 [614 N.Y.S.2d 442, 443] [defendant's wallet found under front seat]; *State v. Hurd* (1996) 325 S.C. 384 [480 S.E.2d 94, 96] ["[u]nderneath the driver's seat, the deputies found a wallet containing Hurd's Georgia driver's license, Hurd's North Carolina identification card, some money, and a speeding ticket issued to Hurd in Lancaster County approximately four hours earlier"]; *State v. Mitzlaff* (1995) 80 Wash.App. 184 [907 P.2d 328, 329] [driver's wallet found under driver's seat].)

These citations amply support the observation that "persons trying to hide their identity will often put their wallets underneath the seat." (*State v. Gordon* (1991) 110 Or.App. 242 [821 P.2d 442, 443]; see also, e.g., *Mallet v. Bowersox, supra,* 160 F.3d 456, 457 [as police officer approached the vehicle, the defendant "hid his wallet and identification under the front seat"; when the officer arrived at the side of the vehicle and requested the driver's license, the defendant "replied that he did not have his license with him and falsely claimed to be Anthony Mallett," his own brother].) We conclude that in the circumstances of this case, the area under Arturo's seat was a location where registration or identification documentation reasonably might be expected to be found.

Arturo insists that even if it is generally reasonable to search for identification or registration documents under the driver's seat, Officer Rowe exceeded the permissible scope of a proper limited search for such documents because he searched an area that the driver could not easily reach and conducted the search from behind the driver's seat. For the reasons that follow, we disagree.

As noted above, Officer Rowe first attempted to search under the seat from the front area of the truck's cab—he reached blindly with his hand under the seat, but felt nothing. Immediately thereafter, the officer approached the same general area beneath the seat from a different vantage point, behind the driver's seat of the truck's extended cab, in a position that allowed him not only to feel, but also to view, the area under the seat. As the Attorney General observes, the space behind the truck's driver's seat would have afforded the officer an opportunity to inspect beneath the seat without restriction from the steering wheel and pedals, etc. At that point, Officer Rowe noticed and seized the pipe and the box in the middle of the area under the driver's seat.

Arturo asserts there is no evidence that this area was "easily accessible" to a driver from the front, or that it could be reached from the front. Initially, we note that the circumstance that a driver might deposit his or her wallet under the driver's seat from the front, while seated, does not necessarily mean that the driver plans to retrieve that wallet from a sitting position within the cab of the vehicle, instead of, for example, retrieving it from a position standing outside the open door. (See *People v. Bauer, supra*, 1 Cal.3d 368, 372 ["After a request for his registration," the defendant, from outside the car, "reached beneath the front seat and pulled out the folder portion of a wallet and extracted an expired, temporary driver's license"].) Moreover, there is no evidence that the area searched was not in fact accessible from the front, easily or otherwise, and Officer Rowe testified that he was searching the area that he believed "would . . . be in control of the driver, which would be the front area." Finally, even if the area searched was not easily accessible from the front, this factor would not be determinative. Items placed under a car seat can shift as the car moves, and an item, such as a wallet, placed originally in an easily accessible position near the front of a seat, may, through the movements of the car, migrate to another location under that seat. In this regard, there is no evidence that the floor area under the driver's seat was partitioned, so as to prevent items placed under the seat in the front from gravitating toward the center area under the seat. We agree with the Attorney General that although the prospective reach of a driver in relation to the location searched is a factor that can be considered in evaluating the reasonableness of the search, it is not determinative.

Nor do we find Officer Rowe's decision to conduct the search from a vantage point behind the driver's seat to be unreasonable. We agree with the Attorney General that "an officer may conclude based upon a variety of factors such as the size of the vehicle, the size of the door opening, the height of the vehicle off the ground, and the positioning of the seat in relation to the steering wheel and pedal, that viewing the area under the driver's seat is more easily and reasonably accomplished from behind the driver's seat rather than from the front seat."

We reject Arturo's suggestion that allowing the limited search here at issue to be conducted from the more efficient vantage point of behind, rather than in front of, the seat constitutes a violation of his Fourth Amendment rights. For example, although it is accepted that an officer under proper circumstances reasonably may search for documentation in a glove compartment, and might gain such access from the driver's seat area, an officer alternatively, and just as reasonably, may gain such access by opening the front passenger door and searching from that vantage point, rather than restricting his or her entry and positioning to the driver's side of the vehicle.

(E.g., *People v. Faddler, supra,* 132 Cal.App.3d 607, 609.) We agree with the Attorney General that "once the officer is entitled to enter the car and look in the area under the driver's seat, the act of positioning his or her head behind the seat and looking forward constitutes no greater intrusion and implicates no greater expectation of privacy than positioning his or her head in front of the seat and looking backward. [¶] Moreover, artificially limiting the vantage point of an officer to essentially the driver's physical space, namely the area in front of the driver's seat, places an unjustified and potentially dangerous burden on the officer. If an officer is entitled to search under the driver's seat but is unable to safely position himself to view that area due to the presence of the steering column and pedals, his only option is to use his hand to blindly feel under the driver's seat or abandon an otherwise justified search."[21]

In sum, the controlling question is whether the officer lawfully was entitled to search the *location* where he was looking. We conclude that it was reasonable for Officer Rowe to view the area underneath the driver's seat. The search was not rendered improper merely because the officer elected to view that area from behind the driver's seat. And if, as here, the officer observes contraband in plain view while conducting a proper limited search for regulatory documents, the contraband properly may be seized. (*Webster, supra,* 54 Cal.3d 411, 431, and cases cited.)

█ Finally, Arturo asserts that Officer Rowe's search was unreasonable because the nature and quality of the intrusion on his Fourth Amendment interests outweighed the importance of the governmental interests alleged to justify the intrusion. (See *Class, supra,* 475 U.S. 106, 118 [106 S.Ct. 960, 968].)[22] Arturo emphasizes that he gave Officer Rowe identifying information—a name, an address in Vallejo, and a date of birth—and accordingly, he argues, no important government interest justified or outweighed the ensuing intrusion upon his Fourth Amendment rights. The record establishes, however, that the officer stopped defendant in Suisun City, more than 17 miles from the Vallejo address given; it was 11:30 p.m., and the driver, a minor, admitted that the truck belonged neither to him nor to his passengers.

___

[21]As the Attorney General also observes, blindly feeling under the driver's seat—as the officer initially did in this case—"presents the officer with unwarranted risks, such as encountering an unsheathed blade or a hypodermic needle."

[22]Addressing the same question in *People v. Hart, supra,* 74 Cal.App.4th 479, 489, the appellate court asserted that determining the constitutional propriety of such a search calls for an evaluation " 'under traditional standards of reasonableness by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other hand, the degree to which it is needed for the promotion of legitimate governmental interests.' " (Quoting *Wyoming v. Houghton* (1999) 526 U.S. 295, 299-300 [119 S.Ct. 1297, 1300, 143 L.Ed.2d 408].)

The driver was unable to provide Officer Rowe with a driver's license or other documentation of his identity, and as the court found, the driver also failed to provide the officer with vehicle registration documentation. Officer Rowe reasonably decided to have the car towed. Prior to actually issuing the traffic citation, the officer decided to conduct a limited search in an area where he reasonably could expect to find the missing but required documentation. It is apparent that at that point Officer Rowe was attempting to determine for himself whether registration information concerning the vehicle's owner was available inside the vehicle, and also was attempting to verify and ascertain the driver's identity (and, indeed, whether he in fact was licensed as a driver), so that the citation could be issued in the driver's true name and show his true address. Under these circumstances, the officer's decision to conduct a limited search for registration and identification documents was reasonable, and the contraband found in plain view during the course of that limited search was properly obtained under the Fourth Amendment and not subject to exclusion.

The Court of Appeal below reached a contrary conclusion, finding instead that "the scope of the officer's intrusion went beyond that justified by the need to locate registration [or other identifying] documents and accordingly, it was unreasonable as a search for registration [or other identifying] documents." In support of its view, the court asserted as follows: (1) "[T]he problem with this search is that the officer testified that he first searched the area 'in control of the driver, which would be in the front area.' . . . It was only when Officer Rowe positioned himself behind the bench seat that the pipe was visible"; (2) "[W]e cannot say that the scope of a search for registration or identification documents in the cab of a pickup reasonably extends to virtually all areas in the physical proximity of the driver"; (3) "The officer did not testify that he was concerned for his personal safety and was searching for weapons"; and (4) "Nor did [the officer] testify that the area below the driver's seat could even be reached by the driver with or without the rear seat in use."

With regard to the Court of Appeal's first point—that Officer Rowe testified he was searching the area within the driver's control, "which would be in the front area," but conducted that search from behind the driver's seat—as we have explained above, the search was not improper merely because the officer elected to undertake it from behind the driver's seat rather than from in front of the driver's seat. Nor do we agree with the Court of Appeal's implication that approving the search here at issue would condone searches for required documentation of "virtually all areas in the physical proximity of the driver." As explained above, the scope of such a search is circumscribed, being limited to places where such documentation reasonably could be expected to be found.

Nor do the Court of Appeal's other two points support a contrary conclusion. It is insignificant that Officer Rowe failed to testify to any suspicion that the driver was armed, because the officer undertook the search in order to find required documentation. Pursuant to *Webster, supra*, 54 Cal.3d 411, and related cases, the limited search here at issue was justified on that basis alone.[23] Finally, the Court of Appeal's assertion that Officer Rowe did not testify that the area below the driver's seat could be reached is problematic as a factual matter on this record,[24] and in any event, as we explained *ante*, at pages 81-83, whether the searched area was or was not easily within reach of the driver while positioned in the driver's seat is a factor to be considered in determining the reasonableness of a limited search for documentation, but is not a dispositive factor.

Accordingly, we conclude in *Arturo D.* (S085213) that the trial court properly denied the suppression motion, and that the Court of Appeal erred in determining otherwise.

### B. *Hinger*

Defendant Hinger asserts that the area underneath a front passenger seat is not a traditional repository of registration or identification documentation, and that pursuant to the Attorney General's proposed test, the "entire car and all of its compartments" might be subject to a *Webster*-type search for required documentation, in violation of the teaching of *Knowles, supra*, 525 U.S. 113.

As noted above, the dispositive question is not whether the area searched is a *traditional* repository for registration or identification documentation.

---

[23]Officer Rowe might well have been concerned for his own safety, however. He faced a driver whom he had stopped for a traffic infraction and who professed to have no required documentation. There were two passengers, one of whom was stretched across the rear seat, and it was late at night. Nationwide, 13 law enforcement officers feloniously were killed while enforcing traffic laws in the year 2000. That year, 6,234 officers were assaulted during traffic pursuits and stops. (FBI, Uniform Crime Reports (2001) Law Enforcement Officers Killed and Assaulted, 2000, pp. 28, 83; see, e.g., *People v. Rodriguez* (1986) 42 Cal.3d 730, 743 [230 Cal.Rptr. 667, 726 P.2d 113] [two CHP officers shot to death while making a late-night traffic stop].)

[24]When asked about the portions of the vehicle he investigated, the officer testified that he searched the area "that I would believe to be *in control of the driver*, which would be in the front area." (Italics added.) Possibly, the Court of Appeal construed the term "front area" as referring only to the area of the cab directly in front of the driver's seat, but not to the front area of the cab below the driver's seat. We note that the trial court, as fact finder, apparently interpreted the same testimony to mean that the officer searched "the area that would be closely attended by the driver of the vehicle." As the Attorney General observes, "the pipe was located in the center of the area under the front seat . . . , which the trial court could readily infer was easily within the driver's reach absent special circumstances blocking the driver's access."

Limited warrantless searches for required registration and identification documentation are permissible when, following the failure of a traffic offender to provide such documentation to the citing officer upon demand, the officer conducts a search for those documents in an area where such documents *reasonably may be expected to be found.* Under this standard, an officer may not search for such documents on pretext (cf. *Class, supra,* 475 U.S. 106, 122, fn. * [106 S.Ct. 960, 970] (conc. opn. of Powell, J.) ["An officer may not use VIN inspection as a pretext for searching a vehicle for contraband or weapons"]), or without first demanding that they be produced (see *United States v. Lopez* (C.D.Cal. 1979) 474 F.Supp. 943, 948-949 [search was unreasonable when officer never asked driver for such documentation and ignored plainly visible registration information posted in car window]), and an officer may not search in containers or locations in which such documents are not reasonably expected to be found.[25] (*Ibid.* [search of crumpled fast-food bag under seat]; *State v. Acosta, supra,* 801 P.2d 489, 493 [search for registration in enclosed "rear interior compartment"].) We emphasize that the standard we reaffirm today circumscribes the scope of a *Webster* search for documents, and, contrary to defendant Hinger's assertion, does not threaten to condone the equivalent of the full-scale search for contraband prohibited by the high court in *Knowles, supra,* 525 U.S. 113.[26]

Defendant Hinger was unable to produce the required registration or license documents upon Officer Skinner's reasonable demand. Hinger appears to suggest that such documentation would not reasonably be expected to be found under a front passenger seat, but on the facts of this case Officer Skinner had reason to extend marginally his search for Hinger's wallet. As noted, the officer had seen Hinger look into the glove compartment (an area directly above the front passenger seat), and the officer reasonably might have thought that while Hinger was doing so, Hinger had managed to place the wallet under the front passenger seat. (Cf. *Mallet v. Bowersox, supra,* 160 F.3d 456, 457 [driver hid his wallet and identification under the front seat as

---

[25]For example, the trunk of a car is not a location where required documentation reasonably would be expected to be found, absent specific information known to the officer indicating the trunk as a location where such documents reasonably may be expected to be found—e.g., as when a driver has told an officer that his registration or license is inside a jacket located in the trunk.

[26]In a related argument, defendant maintains that section 2805, which was relied upon in *Webster, supra,* 54 Cal.3d 411 (and which is quoted and discussed, *ante,* at fn. 5), is unconstitutional because it assertedly purports to authorize the search of an occupied vehicle in violation of applicable constitutional limitations. As noted in *People v. Burnett, supra,* 107 Cal.App.3d 795, 800, and as we observed in *Webster, supra,* 54 Cal.3d at page 430, section 2805 is to be read consistently with applicable constitutional limitations, and, so construed, it is not invalid but simply operates to grant specific statutory authority for certain kinds of vehicle searches and, in conjunction with the case law applying the statute, to reduce a driver's expectation of privacy with regard to such limited searches.

officer approached vehicle].) Moreover, the cases cited *ante*, at pages 80-81, in which wallets (which, we note, often contain a driver's license or other identification or documentation) were found under driver's seats, passenger seats, and "front seats" generally, suggest that the area underneath front car seats (including front passenger seats) is not an unusual place to store such items.

On these facts, and in view of the circumstance that Officer Skinner was preparing to issue a traffic citation and therefore needed to learn the true identity of the person to be cited, we believe it was reasonable for the officer to conduct a limited search of the glove compartment, the area underneath the driver's seat, and the area beneath the front passenger seat.[27] (*People v. Miranda, supra,* 17 Cal.App.4th 917, 927.)

Accordingly, we conclude in *People v. Hinger* (S085218) that the Court of Appeal correctly determined that the trial court properly denied the defendant's suppression motion.[28]

## IV.

The judgment of the Court of Appeal in *People v. Arturo D.* (S085213) is reversed, and the judgment of the Court of Appeal in *People v. Hinger* (S085218) is affirmed.

Baxter, J., Chin, J., and Moreno, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—The situation is a common one: A police officer stops a driver with the intention to issue a traffic citation for an infraction under state law. We address in this case the question whether an officer making such a stop may conduct a warrantless search of the driver's vehicle without violating the driver's right to be free of

---

[27]In the words of the Court of Appeal, "[Officer] Skinner quite reasonably wanted to identify the driver as well as the vehicle. It does little good to issue a traffic citation to a phantom."

[28]Although the point has not been raised in these proceedings, it appears that the officer's search may have been permissible for reasons independent of the analysis we set out above. As noted previously, after Officer Skinner informed defendant Hinger that the officer would search the car for documentation, defendant told him that defendant's wallet might be in the glove compartment. Having been advised that a wallet might be in that location (and hence might contain requisite documentation), Officer Skinner was entitled to protect his own safety by retrieving that item himself, rather than permitting defendant to further rummage about in the glove compartment. (*People v. Hart, supra,* 74 Cal.App.4th 479, 490; *People v. Faddler, supra,* 132 Cal.App.3d 607, 609-611.) Once properly in that position, Officer Skinner also arguably was authorized to search the area near the glove compartment, including the area beneath the passenger seat.

unreasonable searches and seizures under the Fourth Amendment to the United States Constitution. The United States Supreme Court has established several ground rules for warrantless vehicle searches: An officer may search a car if he or she is arresting the driver (*New York v. Belton* (1981) 453 U.S. 454 [101 S.Ct. 2860, 69 L.Ed.2d 768]), or if probable cause exists to believe the car contains evidence of a crime or contraband (*Maryland v. Dyson* (1999) 527 U.S. 465 [119 S.Ct. 2013, 144 L.Ed.2d 442] (*per curiam*); *Carroll v. United States* (1925) 267 U.S. 132, 153, 155-156 [45 S.Ct. 280, 285-286, 69 L.Ed. 543, 39 A.L.R. 790]); subject to certain conditions, police also may search a car to inventory its contents when they are impounding it (*South Dakota v. Opperman* (1976) 428 U.S. 364 [96 S.Ct. 3092, 49 L.Ed.2d 1000]). It is unconstitutional, however, for a state, by statute, to authorize vehicle searches incident to a traffic citation when no arrest is made. (*Knowles v. Iowa* (1998) 525 U.S. 113 [119 S.Ct. 484, 142 L.Ed.2d 492].)

Unlike both the majority and dissent in this case, I find that whether an officer also may undertake some type of vehicle search when the driver stopped for a traffic infraction is unable to present a valid driver's license (Veh. Code, § 12951, subd. (b))[1] or proof of registration as required by state law (§ 4462, subd. (a))[2] are two different matters subject to different analyses and rules. As I explain, I concur in the majority's opinion insofar as it authorizes warrantless searches of "traditional repositories" for proof of a driver's vehicle registration. I dissent, however, insofar as the majority holds that the space beneath the driver's seat is a traditional repository or an otherwise reasonable place to look for a registration document. I dissent also from the majority's holding that an officer constitutionally can search a vehicle for a driver's license.

I

Section 2805, subdivision (a) provides that "[f]or the purpose of locating stolen vehicles, [police] may inspect the title or registration of vehicles, in order to establish the rightful ownership or possession of the vehicle." (See also §§ 4000, subd. (a) [illegal to drive a vehicle unless it has been registered], 4454, subd. (a) [owners must maintain registration card with the vehicle].) Section 2805 thus reflects a legislative intent to permit police officers to determine whether the driver is the rightful owner of a vehicle or,

---

[1] Vehicle Code section 12951, subdivision (b) provides: "The driver of a motor vehicle shall present his or her license for examination upon demand of a peace officer . . . ." All further undesignated statutory references are to the Vehicle Code.

[2] Section 4462, subdivision (a) states: "The driver of a motor vehicle shall present the registration or identification card or other evidence of registration of any or all vehicles under his or her immediate control for examination upon demand of any peace officer."

alternatively, whether the vehicle has been stolen. Permitting police to conduct a limited search of the traditional locations within a vehicle where drivers normally keep registration documents is consistent with the high court's decision in *New York v. Class* (1986) 475 U.S. 106 [106 S.Ct. 960, 89 L.Ed.2d 81], where the court held the overwhelming importance of vehicle identification numbers (VIN's) in the scheme for identifying vehicles on the road justified the minor intrusion in that case. We so held in *People v. Webster* (1991) 54 Cal.3d 411 [285 Cal.Rptr. 31, 814 P.2d 1273], noting the officer in that case limited his search "to the visor and glove compartment, traditional repositories of auto registration." (*Id.* at p. 431.)

I agree the glove compartment and visor (and, in days past, the steering column) are traditional repositories for vehicle registration documentation, and an officer, faced with a driver who does not produce the required registration, is permitted under the United States Constitution to conduct a limited search of those locations in an attempt to obtain such information. The small intrusion caused by such limited searches is not much different from that occasioned by the VIN search approved by the high court in *New York v. Class, supra,* 475 U.S. 106. Were that the extent of the majority's rule, I would concur without comment. But nothing in either *New York v. Class* or *People v. Webster, supra,* 54 Cal.3d 411, authorizes police to conduct a warrantless search for a vehicle's registration documents outside these limited areas. As the dissent explains, failure to place limits on such searches runs the risk of obliterating the rule requiring that exceptions to the Fourth Amendment's warrant requirement be narrow and well delineated. To the extent the majority holds that the space beneath the driver's seat (*Arturo D.*) as well as under the front passenger seat (*Hinger*) are locations in which a person normally or traditionally keeps his or her auto registration or, indeed, are places where the registration might reasonably be expected to be found, I disagree; I therefore conclude the officers in question were not authorized to search in those locations without probable cause to believe they would discover contraband.

## II

Notwithstanding the majority's conflation of registration documentation and a driver's license as "regulatory documentation" (e.g., maj. opn., *ante,* at pp. 76, 79), a driver's license differs from a vehicle registration document and requires a different analysis. A driver is required by law to carry a valid driver's license (§ 12951, subd. (a)) and to present it to a police officer upon demand (*id.,* subd. (b)). Failure to do so is an infraction. (§ 40303.5.)[3] But nothing—not the Constitution, nor any statute, nor the cases cited by the

---

[3]*Refusal* to present one's license is a misdemeanor. (§ 40000.11, subd. (h).)

majority—authorizes police to conduct a warrantless vehicle search in an attempt to discover the license of a driver who asserts he or she does not have it in the car. Nor does common sense support the majority's analysis. Drivers' licenses of themselves, unlike registration papers, are *not* traditionally placed on visors or in glove compartments, much less under seats. The most "traditional repository" of a driver's license is an individual's wallet, usually worn on his person if a man, or carried in her purse if a woman. Given this fact, consistency would require the majority likewise to sanction a patdown search of a male driver, or a search of a female driver's purse, to search for his or her wallet and, finding a wallet in either place, would further authorize the officer to open and inspect its contents. Clearly this is not the law.

Nor does any asserted need to identify the driver support the majority's rule.[4] By what logic would a police officer believe that searching a vehicle for a person's driver's license would be fruitful when the driver has just informed the officer that he does not have a license in his possession? In neither case before the court, nor in any case of which I am aware, did the officer's search yield the license the driver declared he was without. (Cf. *People v. Webster, supra,* 54 Cal.3d at p. 431 [where this court observed that the officer who searched the vehicle for registration papers "had every reason to believe that the occupants, who disclaimed ownership, would not be able to find or produce the registration on their own"]; accord, *People v. Turner* (1994) 8 Cal.4th 137, 182 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Is it reasonable to believe that a driver—just stopped by police for violating a traffic law—has actually secreted his driver's license somewhere in the car and prefers to deny its presence and risk arrest rather than produce it and hope for release pursuant to a traffic citation? The majority's assertion that taking the driver at his word and therefore subjecting him to arrest with its attendant inconveniences would subject the driver to "considerably greater intrusion" than would the search the majority authorizes, and that such a search is " 'most logically calculated to get [the driver] on his way and the officer back to ferreting out more serious criminals in the least amount of time' " (maj. opn., *ante,* at p. 77, fn. 17), is patently fallacious—unless, of course, the majority is speaking only of forgetful drivers who have their licenses, but have forgotten that they do. More realistically, if a law-abiding driver has proper identification he will produce it; if, on the other hand, as in the cases before us, the driver states he lacks the requested license, either he in fact does lack it or the information is in some way incriminating. But that

---

[4] I agree, however, with the dissent that such asserted need is irrelevant under *Knowles v. Iowa, supra,* 525 U.S. at page 118 [119 S.Ct. at page 488], "given its observation that an officer dissatisfied with a driver's proffered identification may arrest rather than merely cite the driver." (Dis. opn. of Kennard, J., *post,* at p. 96.)

criminals stopped for traffic infractions might occasionally lie about having a license in their possession is insufficient reason to carve out, as the majority does, a blanket exception to the warrant requirement to authorize police officers to conduct warrantless vehicle searches in all cases where stopped drivers profess to be without their licenses.

The purpose of requiring a driver to present a license is to assure a citation is not being issued to a " 'phantom.' " (Maj. opn., *ante*, at p. 87, fn. 27.) If the driver fails to produce a license, the officer has several choices: run the driver's name on the computer in an attempt to determine his or her true identity (as the officer did in *Hinger* via his police radio), ask the driver to submit a thumbprint (§ 40500, subd. (a)), accept other evidence of identification (§ 40302, subd. (a)), or arrest the driver (*ibid.*; see *Knowles v. Iowa*, *supra*, 525 U.S. at p. 118 [119 S.Ct. at p. 488]). All these options address the concern that the officer know to whom he or she is issuing the traffic citation, thereby providing some guarantee the infractor will appear in court or pay the required fine. No court has ever sanctioned the alternative the majority endorses here: searching the driver's vehicle (and by logical implication, the driver's person) for the missing driver's license. To the extent the majority endorses such warrantless searches, I dissent.

**KENNARD, J.,** Dissenting.—With a few well-established exceptions, the federal Constitution's Fourth Amendment prohibits a warrantless search without probable cause, as determined by the totality of circumstances known to the officer conducting the search. Today, the majority's unprecedented decision creates a new exception allowing warrantless vehicle searches when a motorist stopped for a minor traffic violation cannot produce either a driver's license or the vehicle's registration. This holding flies in the face of *Knowles v. Iowa* (1998) 525 U.S. 113 [119 S.Ct. 484, 142 L.Ed.2d 492], in which a unanimous United States Supreme Court refused to except from the Fourth Amendment's warrant requirement a vehicle search incident to citing or ticketing the driver for a traffic offense.

The majority insists such warrantless searches are "limited" to areas within a car where identification documentation might reasonably be found. (Maj. opn., *ante*, at p. 65.) Yet the facts of the two cases here suggest otherwise. In one case the officer reached behind and under a truck's bench seat, and in the other the officer searched underneath the front passenger seat. The majority would go even further. It favors warrantless trunk searches for documentation when the officer has "specific information" that those documents "reasonably may be" found in the trunk. (Maj. opn., *ante*, p. 86, fn. 25.) The majority's new rule may well result in limitless searches throughout a vehicle whenever a driver cannot produce the requisite documentation. Because the scope of these warrantless searches weakens the

Fourth Amendment's protection "against unreasonable searches and seizures," I dissent.

## I.

After granting review in these two cases, this court consolidated them to decide the validity of warrantless police searches of vehicles during routine traffic stops.

### A. *In re Arturo D.*

Minor Arturo D. moved to suppress evidence seized during a search of the extended cab pickup truck he was driving on August 26, 1998.

Suisun City Police Officer Michael Rowe testified at the suppression hearing that while patrolling Highway 12 he stopped Arturo for speeding. When Officer Rowe asked Arturo for his driver's license, Arturo said he did not have one, but he gave his full name, date of birth, and home address. Officer Rowe stated on direct examination that Arturo did *not* produce the registration for the truck. But on cross-examination, Rowe was not so sure, saying he could not recall whether Arturo had given him the truck's registration, but that Arturo "might have." Rowe remembered, however, that Arturo said the pickup truck did not belong to him. Rowe never suggested at the suppression hearing that he ever suspected the truck was stolen.

"Just to confirm that there was no identification on [Arturo] or in his vehicle," Officer Rowe did a patdown search of Arturo, after which he searched the truck. Initially, Rowe reached in through the driver's door and ran his hand under the front area of the driver's seat, but finding nothing there he leaned into the area behind the driver's seat and looked under that seat. There, Rowe saw a glass smoking pipe and a small blue box, which upon further examination proved to contain traces of a white powdery substance. Believing that the amount of the substance was "unusable," Rowe intended only to cite Arturo for speeding and for driving without a license. Rowe explained that because Arturo was an *unlicensed* driver, Rowe could not release the truck to him, but had to have it towed. Arturo agreed to go with Rowe to the police station to telephone someone who could pick him up. At the station, Officer Rowe took a closer look at the seized blue box and uncovered a false bottom concealing a plastic baggie containing a usable quantity of methamphetamine.

In contending that the search of the truck did not violate the Fourth Amendment, the prosecution stated it was not seeking to justify the search as

being "incident to the arrest" of Arturo, who was not under arrest at the time of the search of the truck. Rather, the prosecutor sought to uphold the search on the ground that Officer Rowe could properly search the truck for Arturo's identification and the truck's registration. The trial court agreed and denied Arturo's suppression motion. On Arturo's appeal, the Court of Appeal reversed.

### B. *People v. Hinger*

Defendant Randall Hinger moved to suppress a wallet and its contents seized during a warrantless search of his car. At the suppression hearing, Officer Robert Skinner of the City of Orange Police Department testified that on August 20, 1997, he stopped Hinger for making an unsafe lane change. Hinger told the officer he did not have his driver's license with him and did not have registration documentation for the car, which he was "in the process of purchasing." Hinger gave the officer his name. Officer Skinner then contacted police dispatch personnel to ascertain whether Randall Hinger was a licensed driver and whether Hinger or someone else was the car's registered owner.

While awaiting that information, Officer Skinner asked Hinger, who had stepped out of the car, for permission to search the car. When Hinger refused to give consent, Officer Skinner said he would search anyway to look for registration and identification. Hinger replied that his wallet might be in the glove compartment, which was ajar. Officer Skinner opened the passenger door and reached into the glove compartment, but found no wallet, no identification, and no registration. Skinner then went to the driver's side of the car, opened the door, and looked under the driver's seat. Finding nothing, he returned to the passenger side, looked under the front seat, and saw a wallet. Inside the wallet were a check-cashing card bearing Hinger's picture and a clear plastic baggie containing a white powdery substance resembling methamphetamine. Officer Skinner confirmed at the suppression hearing that Hinger was *not under arrest* until Skinner retrieved the wallet, opened it, and found the plastic baggie.

At the hearing, the prosecution argued that when a motorist stopped for a traffic infraction cannot produce a driver's license or car registration, an officer is entitled "to look for identification and registration anywhere inside that vehicle." The trial court agreed, and denied Hinger's suppression motion. That ruling was upheld on appeal.

### II.

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches or seizures" by the police. A warrantless search is

invalid "unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." (*Flippo v. West Virginia* (1999) 528 U.S. 11, 13 [120 S.Ct. 7, 8, 145 L.Ed.2d 16]; see also *Katz v. United States* (1967) 389 U.S. 347, 357 [88 S.Ct. 507, 514-515, 19 L.Ed.2d 576].) Among those exceptions are the search of a person that is conducted incident to arrest (*United States v. Robinson* (1973) 414 U.S. 218, 234-235 [94 S.Ct. 467, 476-477, 38 L.Ed.2d 427]), the search of a car's passenger compartment incident to the driver's arrest (*New York v. Belton* (1981) 453 U.S. 454, 460 [101 S.Ct. 2860, 2864, 69 L.Ed.2d 768]), and the search of a car when there is probable cause to believe it contains contraband or evidence of a crime (*Maryland v. Dyson* (1999) 527 U.S. 465, 466 [119 S.Ct. 2013, 2014, 144 L.Ed.2d 442]; *Carroll v. United States* (1925) 267 U.S. 132, 153 [45 S.Ct. 280, 285, 69 L.Ed. 543, 39 A.L.R. 790]). Evidence obtained in violation of the Fourth Amendment's warrant requirement is inadmissible at trial. (*Mapp v. Ohio* (1961) 367 U.S. 643, 655 [81 S.Ct. 1684, 1691-1692, 6 L.Ed.2d 1081, 84 A.L.R.2d 933].)

Today, the majority holds that whenever a police officer detains a motorist for a traffic infraction and the motorist fails to produce a driver's license or car registration, the officer may search those areas of the vehicle where such documentation "reasonably may be expected to be found." (Maj. opn., *ante*, p. 65.) This holding does not fit any of the narrow and well-delineated exceptions to the warrant requirement that the United States Supreme Court has recognized. Worse still, it directly conflicts with the high court's unanimous decision in *Knowles v. Iowa, supra,* 525 U.S. 113 (*Knowles*).

*Knowles* concerned the validity of a search conducted under an Iowa statute allowing a police officer with "cause to believe" that a motorist had committed a traffic violation either to make an arrest and "immediately take the person before a magistrate," or to "issu[e] a citation in lieu of arrest." (*Knowles, supra,* 525 U.S. at p. 115 [119 S.Ct. at pp. 486-487].) Iowa law further provided that the officer's decision to issue a citation instead of arresting the traffic offender did " 'not affect the officer's authority to conduct an otherwise lawful search.' " (*Ibid.*) The officer who had cited Knowles for speeding searched the car and found "a bag of marijuana and a 'pot pipe' " under the driver's seat. (*Id.* at p. 114 [119 S.Ct. at p. 486].) The trial court, relying on the Iowa statute allowing a search incident to citation, denied Knowles's suppression motion. The Iowa Supreme Court upheld the search, reasoning that "so long as the arresting officer had *probable cause to make a custodial arrest,* there need not in fact have been a custodial arrest" before the officer could search the car. (*Id.* at pp. 115-116 [119 S.Ct. at p. 487], italics added.)

The United States Supreme Court granted certiorari to determine whether the search of Knowles's car fit an exception to the warrant requirement

similar to the one allowing a search of *a person* incident to arrest (*United States v. Robinson, supra,* 414 U.S. at pp. 234-235 [94 S.Ct. at pp. 476-477]), or a search of *a car's interior area* incident to arresting its driver (*New York v. Belton, supra,* 453 U.S. at p. 460 [101 S.Ct. at p. 2864]). The court noted the "historical rationales" underlying the search-incident-to-arrest exceptions: (1) the need *to disarm* the person to be taken into custody, and (2) the need *to preserve evidence.* (*Knowles, supra,* 525 U.S. at p. 116 [119 S.Ct. at p. 487].) Neither, the court observed, is present when an officer searches a car incident to citing a person for a traffic violation. (*Id.* at p. 117 [119 S.Ct. at pp. 487-488].)

The high court noted that the "threat to officer safety from issuing a traffic citation" where the suspect is not being transported is "a good deal less than in the case of a custodial arrest." (*Knowles, supra,* 525 U.S. at p. 117 [119 S.Ct. at p. 487].) Officers conducting routine traffic stops have "other, independent bases to search for weapons and protect themselves from danger," such as ordering the driver and any passengers out of the car, performing a " 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous," and conducting a limited search inside the car "upon reasonable suspicion that an occupant is dangerous and may gain immediate control of a weapon." (*Id.* at pp. 117-118 [119 S.Ct. at p. 488].)

Turning to the second historical justification for the search-incident-to-arrest exception to the warrant requirement—the need to discover and preserve evidence—the court observed that "[o]nce Knowles was stopped for speeding and issued a citation, all the evidence necessary to prosecute that offense had been obtained." (*Knowles, supra,* 525 U.S at p. 118 [119 S.Ct. at p. 488].) "No further evidence of excessive speed was going to be found either on the person of the offender or in the passenger compartment of the car." (*Ibid.*)

In sum, because in the case of a traffic citation "the concern for officer safety is not present to the same extent [as with an arrest] and the concern for destruction or loss of evidence is not present at all," the United States Supreme Court invalidated the search of Knowles's car incident to a citation for speeding. (*Knowles, supra,* 525 U.S. at p. 119 [119 S.Ct. at p. 488].)

Unlike Iowa's statutory scheme that was before the high court in *Knowles,* no California statute authorizes a police officer to *search* a car incident to a traffic citation. California's statutory law is similar to Iowa's, however, in granting police in most cases involving minor traffic offenses the discretion either to cite or arrest the driver. (See Veh. Code, §§ 40302, 40500.) And our

statutory scheme requires a driver to carry a driver's license and to have the car's registration in the car. (Veh. Code, §§ 4462, subd. (a), 12951.) The failure to produce either upon the request of an officer is an infraction. (Veh. Code, § 40000.1; *People v. Superior Court [Simon]* (1972) 7 Cal.3d 186, 193-195 [101 Cal.Rptr. 837, 496 P.2d 1205].)

Today, the majority holds that when an officer detains a driver for a suspected traffic offense and the driver fails to produce a driver's license or the vehicle's registration, the officer, even though not intending to arrest the driver either for the traffic offense or for the failure to produce the required documentation, can nonetheless conduct a "limited warrantless search[]" for these documents "within a vehicle." (Maj. opn., *ante*, p. 65.) In doing so, the majority writes into California law essentially the same search-incident-to-citation authority that Iowa created by statute and that the United States Supreme Court rejected in *Knowles*, *supra*, 525 U.S. 113.

There, in responding to Iowa's argument that car searches incident to issuing traffic citations could be justified because drivers "may attempt to hide or destroy" evidence of identity such as "a driver's license or vehicle registration," the high court pointed out that "if a police officer is not satisfied with the identification furnished by the driver, this may be a basis for *arresting him* rather than merely issuing a citation." (*Knowles*, *supra*, 525 U.S. at p. 118 [119 S.Ct. at p. 487], italics added.) That option was available here too. That an arrest may require the expenditure of "considerable time and resources necessary to undertake a full stationhouse booking (with possible towing, impounding, and inventorying of a vehicle)" (maj. opn., *ante*, p. 76, fn. 17) is irrelevant under *Knowles*, given its observation that an officer dissatisfied with a driver's proffered identification may arrest rather than merely cite the driver.

In trying to distinguish this case from *Knowles*, *supra*, 525 U.S. 113, the majority points out that the blanket rule it adopts today would authorize only a *limited* search for a driver's license or vehicle registration in those areas of a car where such documents "reasonably may be expected to be found." (Maj. opn., *ante*, p. 65, italics added.) But the car searches here were far from "limited."

With regard to the search of Arturo's extended cab truck, Officer Rowe first looked under the front area of driver's seat. Not finding identification documentation, he then leaned into the area behind the driver's seat and reached underneath, finding a small blue box with a substance later determined to be methamphetamine.

With respect to the search of Hinger's car, Officer Skinner first searched the glove compartment; then he looked under the driver's seat; and finally he

reached under the passenger seat where he found the wallet containing Hinger's identification and the methamphetamine.

The majority describes each of these two warrantless vehicle searches incident to traffic stops as "limited" and thus proper. But such a search is no less broad than the full car search that the high court invalidated in *Knowles* where, after citing the driver for speeding, the officer searched under the driver's seat and found "a bag of marijuana and a 'pot pipe.' " (*Knowles, supra*, 525 U.S. at p. 114 [119 S.Ct. at p. 486].) The majority would also permit a warrantless trunk search for identification and registration documentation when the officer has "specific information" that those documents "reasonably may be" found in the trunk. (Maj. opn., *ante*, p. 86, fn. 25.) In this instance, too, the scope of such a search goes far beyond the search that the United States Supreme Court rejected in *Knowles*.

In yet another futile effort to distinguish its holding from the type of search prohibited in *Knowles, supra*, 525 U.S. 113, the majority stresses that *Knowles* involved a warrantless search "for contraband *following* the issuance of a traffic citation," whereas here the warrantless searches were for "regulatory documentation, *prior* to issuing a traffic citation." (Maj. opn., *ante*, p. 76, italics in maj. opn.) Why should this distinction matter at all? A search incident to a routine traffic stop when an officer has yet to decide either to arrest or merely cite a driver has even less justification than the search invalidated in *Knowles* conducted after the officer had cited the driver.

Nor should it matter, contrary to the majority's suggestion at page 76, *ante*, that the search in *Knowles, supra*, 525 U.S. 113, was for "contraband" whereas here the searches were for "regulatory documentation." Invalidating the search in *Knowles*, the high court expressly rejected Iowa's contention that a blanket rule allowing car searches incident to traffic citations would be justified because drivers might conceal their " 'license[s] or vehicle registration[s].' " (See *ante*, p. 75, quoting *Knowles, supra*, 525 U.S. at p. 118 [119 S.Ct. at p. 488].)

Ultimately the majority rests its holding on *People v. Webster* (1991) 54 Cal.3d 411 [285 Cal.Rptr. 31, 814 P.2d 1273] (*Webster*), which this court decided seven years before *Knowles, supra*, 525 U.S. 113. In *Webster*, four justices of this court signed the majority opinion that affirmed a judgment of death. I concurred in the judgment and wrote separately on an issue unrelated to the Fourth Amendment. (See *Webster, supra*, at pp. 468-470 (conc. & dis. opn. of Kennard, J.).)

In *Webster*, an officer stopped the defendant for speeding. The defendant denied owning the car, claiming it belonged to someone in the backseat, but

then said that all five of his passengers were hitchhikers. A radio check revealed that the defendant had an outstanding warrant, and the officer *arrested* him. When the officer asked the passengers who owned the car, all five "shrugged or shook their heads." (*Webster, supra,* 54 Cal.3d at p. 429.) The officer then looked in the car's "glove compartment and visor for registration papers." (*Ibid.*)

Given the totality of circumstances known to the officer in *Webster,* he was amply justified in searching the car for registration. All six of the car's occupants, including the driver, had denied that it was their car, and the officer had arrested the driver on an outstanding warrant, a fact that standing alone gave the officer cause to make an incidental search of the car's passenger compartment: "[W]hen a policeman has made a lawful custodial *arrest* of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." (*New York v. Belton, supra,* 453 U.S. at p. 460 [101 S.Ct. at p. 2864], italics added, fn. omitted; see also *United States v. Gonzalez* (11th Cir. 1996) 71 F.3d 819, 826 [applying the *Belton* rule to uphold the search of a car's glove compartment incident to its driver's arrest on a warrant].)

The majority, however, seizes upon this sentence in *Webster*: "*Within constitutional limits,* such statutes [requiring drivers to carry licenses and vehicle registration in a car] authorize an officer to enter a stopped vehicle and conduct an immediate warrantless search for the required documents." (*Webster, supra,* 54 Cal.3d at p. 430, italics added.) The majority reads far too much into this isolated sentence from *Webster.*

As the qualifying phrase "[w]ithin constitutional limits" suggests, *Webster* recognized that an officer's mere desire to secure license or registration documents from a motorist would be insufficient by itself to qualify as an exception to the Fourth Amendment's warrant requirement. (*Webster, supra,* 54 Cal.3d at p. 430.) And when read in the context of the facts of that case, the sentence stands for this unremarkable proposition: When an officer has *arrested* a car's driver and is determining whether to impound the car or release it to one of its passengers, and no occupant of the car claims to know who owns the car, the officer is justified to search for evidence of ownership in the "glove compartment and visor" of what apparently is an abandoned car. (*Id.* at p. 429.) The *Webster* language at issue does not support the majority's far broader rule that whenever a traffic violator cannot produce either a driver's license or car registration, the officer, without making an

arrest, can conduct a full search of the car for identifying documentation.[1] Furthermore, such a rule is contrary to *Knowles*, in which the United States Supreme Court refused to authorize warrantless vehicle searches when the driver has "merely" been cited but not arrested. (*Knowles, supra*, 525 U.S. at pp. 118-119 [119 S.Ct. at pp. 488-489].)

## III.

Unlike the majority, I would not adopt a blanket rule permitting police to make a warrantless search of a car for identification documentation or vehicle registration anytime a driver cannot produce these documents. Instead, I would evaluate car searches by applying established law, which permits a warrantless search of a car only if it falls within one of the "narrow

[1]Nor does *Webster, supra*, 54 Cal.3d at page 431, support a narrower rule, urged by the concurring and dissenting opinion, allowing a warrantless search for a car's registration documents (but not the driver's license) in "the glove compartment and visor," which the opinion describes as "traditional locations within a vehicle where drivers normally keep registration documents." (Conc. & dis. opn. of Werdegar, J., *ante*, at p. 89.) The search for registration documents was justified in *Webster* only because all six of the car's occupants claimed not to know who owned the car, an uncommon situation, not present here, that negated the existence of a reasonable expectation of privacy.

The concurring and dissenting opinion also relies on the United States Supreme Court's five-to-four decision in *New York v. Class* (1986) 475 U.S. 106 [106 S.Ct. 960, 89 L.Ed.2d 81] (*Class*) upholding a limited warrantless vehicle search that the concurring and dissenting opinion claims is "not much different" from the search at issue here. (Conc. & dis. opn. of Werdegar, J., *ante*, at p. 89.) Not so.

In *Class*, an officer looking for the vehicle identification number (VIN) of a car that had been stopped for a traffic violation, and not finding it on the left doorjamb, moved some papers on the dashboard that covered the VIN. In upholding this search, the high court noted "the lack of a reasonable expectation of privacy in the VIN" because federal law required that the VIN be displayed either on the left doorjamb (for cars built before 1969) or on a part of the dashboard visible through the windshield (for cars built later). (*Class, supra*, 475 U.S. at p. 119 [106 S.Ct. at p. 968].) Here, by contrast, no federal law (or state law either) requires that registration documents be kept behind the visor or in the glove compartment, and thus California drivers have not relinquished their expectations of privacy in these locations. The high court in *Class* also stressed that the officer in that case "did not root about the interior" and "did not reach into any compartments." (*Id.* at p. 118 [106 S.Ct. at p. 968].) Here, however, the concurring and dissenting opinion would authorize officers searching for registration documents to enter a car, to reach behind the visor and into the glove compartment, and to inspect any documents they might find in those locations, an invasion considerably more extensive than that approved in *Class*.

The concurring and dissenting opinion construes Vehicle Code section 2805, subdivision (a), which states that police may "inspect the title or registration of vehicles, in order to establish . . . rightful ownership," as authorizing vehicle searches for those documents behind the visor and in the glove compartment. (See conc. & dis. opn. of Werdegar, J., *ante*, at pp. 88-89.) I disagree with that interpretation. By its terms, the statute only permits an officer to *inspect* the documents, not to conduct a warrantless *search* for them. Warrantless searches of a car's interior are not only unauthorized, but also unnecessary. From outside a car, an officer may see the VIN on the dashboard of any car made since 1969, and from the VIN the officer may readily determine the car's ownership and registration.

and well-delineated exceptions to the warrant requirement" specified by the United States Supreme Court. (*Flippo v. West Virginia, supra,* 528 U.S. at p. 13 [120 S.Ct. at p. 8].) Among these exceptions is the rule permitting police officers to search a car when they have probable cause to believe it contains contraband or evidence of a crime. (*Maryland v. Dyson, supra,* 527 U.S. at p. 466 [119 S.Ct. at pp. 2013-2014].) Probable cause is evaluated on a case-by-case basis, applying a "totality of the circumstances" test. (See *United States v. Arvizu* (2002) 534 U.S. 266, 273 [122 S.Ct. 744, 750, 151 L.Ed.2d 740]; *United States v. Sokolow* (1989) 490 U.S. 1, 8 [109 S.Ct. 1581, 1585-1586, 104 L.Ed.2d 1].) This standard takes into account an officer's common sense and experience to determine whether there is "a fair probability that contraband or evidence of a crime will be found." (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [103 S.Ct. 2317, 2332, 76 L.Ed.2d 527].) Here, the prosecution failed to justify the searches on this or any other well-delineated exception to the warrant requirement.

In each case, the officer stopped the driver for a traffic infraction. Arturo D. admitted he was an unlicensed driver, but he gave the officer his name, address, and birth date. With respect to Hinger, he could not produce either his driver's license or the car's registration, but he told the officer his name and said he was in the process of buying the car. The officer then placed a radio call to police dispatch personnel to verify Hinger's identity and to ascertain whether he owned the car. In each case, had the officer been dissatisfied with the proof of identity offered, he could have arrested the driver (see Veh. Code, § 40302, subd. (a)) and, incident to such an arrest, could have searched the vehicle's interior (*New York v. Belton, supra,* 453 U.S. at p. 460 [101 S.Ct. at p. 2864]). In each case, however, the officer testified at the suppression hearing that at the time he undertook the vehicle search, *he had no intent to arrest the driver.* Furthermore, in each case the prosecution sought to justify the search on the single ground that whenever a driver cannot produce statutorily required documentation, the officer has *the right to search for it inside the car.* The prosecution neither advanced nor developed a record to support any other theory. (See *Green v. Superior Court* (1985) 40 Cal.3d 126, 137-138 [219 Cal.Rptr. 186, 707 P.2d 248] [on issues of search and seizure, prosecution is generally precluded from advancing new theory on appeal].) Under these circumstances, the prosecution failed to carry its burden of establishing probable cause or some other exception to the Fourth Amendment's warrant requirement for each search, and the suppression motions in both cases should have been granted.

### CONCLUSION

Who among us can ever forget the horrendous events of September 11, 2001, when our nation suffered the most destructive terrorist assault in our

history? As this opinion is being written, our nation is undergoing a painful recovery from the devastating physical and psychological effects of that day. One part of this recovery process has been an effort to devise and implement more effective methods of law enforcement to protect the security of our citizens and our institutions. Another and equally important part of this process must be a rediscovery of and rededication to the principles upon which our nation was founded and which have made it a true beacon of liberty throughout the world.

One principle, so basic to our personal liberty, is the prohibition that the Fourth Amendment to the United States Constitution places on unreasonable searches and seizures. In determining whether a search is "unreasonable," a court must adhere to the decisions of the United States Supreme Court articulating the meaning of that word in a similar case. Virtually identical to the two cases here is the high court's unanimous decision in *Knowles v. Iowa, supra*, 525 U.S. 113. There, the court held that when a police officer has stopped a motorist for a routine traffic violation, and the officer has not arrested the motorist, the officer may not rummage through the vehicle.

Today's majority decision does nothing to enhance our security and does much to erode our Fourth Amendment rights. Under California law, an officer making a routine stop for a traffic violation may arrest a motorist who fails to produce proof of identity and, within the limitations of the Fourth Amendment, may search the vehicle incident to the arrest. Given this ability, there is no justification for the warrantless, nonconsensual search of a car's interior when the officer has made *no* arrest and the officer lacks probable cause to believe that the car contains contraband. In announcing a blanket rule authorizing such searches, the majority disregards the high court's decision in *Knowles* and chips away at one of the fundamental freedoms guaranteed by our federal Constitution.

Brown, J., concurred.